Thank you. I think that the first argument that we should make relates to the due process argument in relationship to the conduct of the judge. And I would note that in relationship to the Cominar case, Cominar v. INS, that there needs to be, I see, evidence of a preconceived bias. I do think that in the transcript itself, there are items that would rise to that level. Starting with the beginning in the master hearing, where the judge indicates when there's a the writer is coming in to Mr. Doe, and I got a married couple months ago, now qualifies as a to his asylum application. Seems to be, I think, the trend. Yeah, Mr. Doe to judge. I don't know what the trend is, Your Honor. Ms. Taylor to Mr. Doe. It's the trend of aliens from the Soviet Union conveniently getting married just before filing for asylum. Mr. Doe to Ms. Taylor. Oh, judge to Mr. Doe. Okay, so they want to go without an attorney. Then at a second time, where we start to see there may be a preconceived notion in relationship to handle the case, it starts at the very beginning of the individual hearing. And this is at 147 colon 15 to 19. And that's where the judge immediately starts to question the case. Now, I just want to ask, has anybody noticed whether there are contradictions between the two applications at this point? And what's the I-589? Because that may raise an issue with respect to having been given the frivolous warnings. I'm just whenever there's a change in the application that concerns me, if it's giving more details and that sort of thing, it's not problematic. I suggest that the burden to show due process from bias is a very hard one. It may feed into the credibility issue, but I at least would prefer that you talk about the credibility issue. I think they're interrelated in the sense that the strength or weakness of the judges' determinations of non-responsiveness, for example, if they began to seem questionable, might suggest that there was some preconceived notion there. But it works for me better to look at the actual determination and to look at whether the judge was biased. All right, I understand, Your Honor, and I'm more than willing to do that. But particularly in regards to the credibility issues that arise, I think that one of the things that is affected is the ability for the judge to understand what is actually taking place because there's a problem. There appears to be a problem with the translation. Now, I am not going to represent to this- Can I ask you a question? Why do you think there's a problem with the translation? I read the transcript, and it seemed to me that where there are misunderstandings or issues most of the time, either there wasn't a follow-up question or there was an answer that didn't. I guess I don't want to steer you away from Judge Berzon's question. It sort of struck me that what's important, at least for me, is what's the materiality of any alleged inconsistencies? Are there any cultural issues where the translation component can somehow be explained? And what's the sort of best evidence that you have that the credibility determination is inaccurate? Well, the first thing I'd say is in relationship to the credibility issue, there's this reliance upon the idea that he was leaving the country on an ongoing basis, but that doesn't really follow the cases that relate to that. Because when you look at the issues in each one of the cases that relate to the Loja and Bora Gonzalez cases- Are you talking about just the fact that he traveled back and forth? Right. That's not what I was asking. Let me put it this way to you. In the record, it seems to me that your client testified that he joined the army. He refused to take an oath. That's all in the transcript. In the army itself, he was given- the transcript seems pretty clear- the worst of the worst jobs. He was given no opportunity to be a regular soldier, but was relegated to some sort of mechanic position and cleaning toilets. And then once he got out of the military, he had a permanent ID card that essentially branded him as an individual who refused to take the oath of allegiance or an oath in connection with his military service. That he is a component of a minority group within Belarus and that he had difficulty attempting to procure employment. Have I misstated anything? To the extent that you're talking about what took place at the military, he was also beaten. He was hit by a wooden stick on a continuous basis. Have I misstated anything? Well, you haven't misstated what was happening, but there is also other additional things. Like for example, when he became a driver and he was driving back and forth, his father had requested that he bring in religious materials from the other countries, Latvia and the other other things, which he did. And he was then terminated after he was stopped by patrol officers. What this case feels like to me is a mismatch between an adverse credibility finding. Because clearly, at least a big chunk of what he was, the story, most of it seemed to be true. The problem was that it doesn't have much in it that is, since he was in the army, that indicates any persecution. As opposed to discrimination or harassment or something else. Why it is that the IJ and the BIA treated the case as a credibility case, rather than simply saying, well, there's no well-founded fear of future persecution. I don't know. But that's my sense of the case, that we're sort of dealing with a case where the BIA or the IJ said he wasn't credible, but that's really what he meant was he wasn't credible in so far as he said that there was any persecution of him, at least after he left the army. It's a peculiar situation. Is it your understanding that he was found overall not credible? They didn't believe the story that he was in the army or that he was a Pentecostal or any of that? Well, I think what they're saying is that certain things like him leaving the country on an ongoing basis, shows that he doesn't have a fear of being in the country, which is the job that he had. That doesn't go to past persecution, that goes to whether he has a well-founded fear of the future. That's what they focused on, the well fear, and also focused on it in regards to the issue of credibility, because they're saying that he wasn't credible, that he had a well-found fear or he had any fear in that he was kept going back and forth between these other countries. But that ignores the fact that it wasn't like all the cases that are cited, where the person leaves the country, comes to the United States and then goes back. Here we have a situation where he's going back and forth within former portions of the Soviet Union. He was basically living his life and we have no idea whether he could have gotten any kind of asylum or anything else, wherever he was going. My question is, post-military, what do you point to as evidence of past persecution? In the military? Other than the military? Military. Military, it seems to be discrimination because he didn't take the oath, which he didn't do because of his religion. But it doesn't seem to be persecution. Well, I disagree to the extent that he was beat with a wooden stick while he was in... After that, post-military. Post-military, I still think that a level of persecution here, which is a religious case, which relates to his ability to practice his religion, is first shown by the fact that he's bringing these religious materials back and forth between the country and... What happened to him as a result? He got fired as a result of that. Okay, but getting fired usually isn't considered persecution. Well, to the extent that it's economically impacts the person, it can be considered... But he did have a job most of the time. He had jobs. Well, he had periods of times he didn't have jobs. And the other thing is, they're saying that going back and forth shows that he didn't have a fear, and he did. This is my problem, okay? I find that whole argument weak, but it isn't what the BIA said. The BIA said he was not credible, and therefore, they found there was no past persecution. And they never really made an inquiry, I don't think, I will ask Ms. Glazer this, into whether the BIA didn't, into whether he, if he had past persecution, with a presumption that then switched in the other direction, whether he had A, a well-founded and a subjective fear of future persecution, and B, a well-founded future fear. So my question is, if I saw the case that way, what would I do with it? What would I do with the case? Would I grant it? Remand it. I'm sorry? I think you'd grant it and remand it for further hearing. Well, can I ask you whether there's evidence of the country, because even without past persecution, he could demonstrate a well-founded fear of future persecution if returned to Russia. Was there evidence in the record as to the country conditions and the persecution? There was a lot of record in relationship to it, because of the fact that there was probably at least 10 different documents relating to the current conditions of the country, including the U.S. reports, the U.N. reports, and all showing the problems with the ability for him to engage in his protected activity of religious, of his religious sect. The evidence of persecution of Pentecostals, I understand, because the problem is the standard is tough. It's not enough that, you know, it's discouraged or interfered with. I mean, somebody has to be essentially hurt. Yeah, there was things within the record that were produced with all the reports where they went through. I know. And as you said, in summary, what does it show? It shows that there were beatings taking place, that people were closing down their, closing down the facilities, which were the churches and things. They were preventing churches from being able to come in. And when they did, they would go and they would knock people out because they were not behaving. They were not following the law. There was the 2002 law that was passed, right? That outlawed the church. That's the law that required registration. And not only that, it required that all the people within the church, the founders, at least in the church, all had to give their addresses and be registered with the government. So the government of Belarus has a list of every to me, reminds me of the way that the Nazis did it in Germany in regards to documentation of individuals. And that's problematic because then they can start to do things like where my client comes across when he's bringing religious material into the country of putting him potentially at risk. All right. Well, Counselor, you're over your time. Let's hear from the government. Okay. Good afternoon, Your Honors. May it please the court. Sherry Glaser appearing on behalf of the United States Attorney General. Your Honors, there really are just two issues in this case. And the first is the adverse credibility determination. The government would argue that the board didn't reach a determination on if an alternate determination concluding that if he is in fact credible, I know the immigration judge. That's why I really have a problem because it seems to me that the adverse credibility finding, I don't even really understand what it is. I mean, we tend to think that these are generic overall credibility findings, but I find it hard to believe that anybody that they weren't were they not believing that he was Pentecostal? Were they not believing that he was actually treated that way in the army? What is it that they were not believing? The agency was just overall not really believing anything because there was not enough detail. That's what the finding was that it seems non-sustainable because even the things that for the most part, as far as I can tell, it was that they were asking him questions about what happened to him and he answered with generic answers. Whether that's because he didn't understand the question or whether that's the way he understood how he should answer that is, you know, what was happening to me is the same thing that was happening to everybody like me, or more likely because nothing was happening to him particularly. It was happening to people in the notion that he was not credible overall because of that doesn't seem to have any sense in ordinary kind of psychology or how people respond. I also went over the transcript pretty carefully and I could see that he was asking at points answering specific questions about him with more general answers, but that's if I could see. I couldn't see that he was being evasive or anything. Could I just add to that? I'm so sorry. Just as an aside to that question, I almost felt like there was sort of a cultural disconnect with the form of the questions and the way that he understood and answered some of them. There are also examples of the interpreters seem to be somewhat confused. So, reading this lengthy transcript, I had the same overall impression as Judge Burson. Okay. I'm happy to address both of them. It's unusual, I will say, to have an adverse credibility determination that is not grounded. I know you didn't mention this, Judge Burson, in really inconsistencies and whatnot. Moreover, there are certain things that there is just no basis for disbelief. I mean, whatever is true of the things that they were asking him at the end, is there any basis for thinking that he wasn't Pentecostal or that this didn't happen to him in the army? I mean, his army form is in the record and it does say didn't take the oath. So, there's no basis for disbelieving any of that. I respectfully disagree when you look at the six instances regarding the testimony that the immigration judge actually cited, that the questions that he's asked, he doesn't provide the detail to support a claim. I understand that, but they don't have to do with the things that I just talked about. They have to do with things that happen later. And as I say, the answers, it isn't that the answers weren't somewhere in the ballpark, but they tended to be about generic answers instead of specific answers. And therein lies the problem in that he didn't provide the details about what exactly he claims happened to him and his family. Probably because nothing did. That's why I don't understand why the agency decided this question, this case, the way it did. I can understand why you feel that way. It would have been very nice if the board had addressed the second issue. Well, I would argue if this court does not agree with the adverse credibility determination, and I would urge this court to not reach that determination, but if it does, it has to remand the case so that the board can address the alternate determination. Because in the government's view, the board didn't address the alternate determination. It just reached the credibility determination and it looked at his due process claim. And with regards to his due process claim, you know, there were instances in the testimony. Aren't those sort of inextricably intertwined, the transcript, the four days of hearings, and sort of part two? And just to make this a two-part question, you know, the IJ cited certain portions of the transcript indicating inconsistencies. And the very first example I came across is, you know, respondent testified on direct examination that Cossacks often physically harmed and threatened and the coastal worshippers in small villages. Respondent's attorney then asked respondent if the Cossacks ever mistreated respondent and his family. Respondent said, that was exactly what he was involved in, which I, you know, read that as meaning mistreatment and a little ambiguous about whether that means by Cossacks in his village, but arguably it does. And then it says when his attorney asked him to explain, he said that he was desperately mistreated while he was serving in the army. And the judge writes, this answer was not responsive. But I don't know that it's not responsive because he seemed to be thinking that the question asked him, you know, about mistreatment as opposed to Cossacks. So if that's the sort of best example. You know what Cossacks are? I mean, I have some background in history. I do. Cossacks are, you know, there's a habit of calling anybody who's kind of a Neanderthal kind of person a Cossack. So a person who's going to attack you for your religion is a Cossack. I mean, it's not, it's not a very precise term that relates to any, you know, particular group. It's a Cossack, a bad person. That is one example. I would argue that the other examples that the immigration judge relied on with regards to the adverse credibility determination are in fact stronger and that there really is no connection whatsoever between the question asked and what he said. For example, the second example. Sure. So when he was asked how the government prevented him from expressing his political opinion, he discussed the army. And what he did was he said that he was asked to whom he expressed his political beliefs. And he said to fellow soldiers. And then when asked after that, how he was mistreated, he said that officers beat him. And then when it was noted that he said that expressed his political opinion to soldiers, not officers, and then asked again, what harm he suffered, he went into a discussion about how quote unquote, they were patriots, and how individuals who were against things happening in their countries were enemies. And that did not respond at all to sort of the original questions asked. And he also had a lot of trouble in the discussion. It's not a sensible thing to say that the that that he was speaking to his fellow soldiers and the officer Scott wouldn't have been went and went after him. Well, that could have happened, but still the less plausible story. I would argue that looking at the latter portion of that testimony, it isn't plausible. And he again, didn't answer the question asked again, when asked, this is specifically what he said, when he was asked how again, the second time in this same testimony, what harm he suffered in the army, he said, quote, they were irritated by all that they were patriots of their country, and those people who, and those people who were against something happening in their country were considered enemies. And then he asked again, and then when he was asked again, how that deals with his political opinion, he said that means that those people have the Soviet mentality. Now, these questions were trying to get at what harm he specifically suffered. And this is all on page 271. Your honors, it starts at line 12 to 15, and then blends into 17 to 22, and then 24 to 25. And that he didn't respond to the original question asked, which really was what harm he suffered. And the same is true with regards to when he's asked to provide an approximate date for when he's sure, just one second, 271 of the record, and then it's lines 12 to 15, 17 to 22, and then 24 to 25. And then it kind of bleeds into the very top of page 272 of the record. And then when he's asked to provide to provide even an approximate date for when he at the beginning of that, he says, I told him that Pentecostal believers are normal people, they're not sectarian people. I talked against the government making these people look like crazy people. So is that a political opinion? Well, it seems like it is. But we talked on various topics and talking about freedom of believers to worship and go to different churches and talking about the so called manipulations which were done against believers, the obstacles which were put on their way to God. So how are you mistreated for saying that people should be free to worship? The officers in the army treated me as an enemy. That seems like a responsive answer. And then yeah, no default fellow soldiers. I'm trying to figure out how you're expressing your belief to your fellow soldiers resulted in your being mistreated. So then he explains that they're different. It seems to me there's an implicit connective between I was telling all this to the soldiers and they were irritated and then the officers treated me like an enemy. I don't see why that's not a connected answer. I would argue there's another part. I would argue that it is still non responsive and vague and he didn't provide any information about how he was in fact harmed when he that really was the question that was asked. And the same is true when he's asked about when he started attending the church in Belarus. So he first said that his family helped build the church and he said that occurred after perestroika and they started attending in 1995. And then when he's asked when perestroika occurred, he said 2000. He's then confronted with the fact that 1995 was actually before perestroika according to his answer that perestroika occurred in 2000. And at that point he changes his answer and he says that construction on the church began in 2001 and continued through 2005. And then when he's asked about his earlier answer that construction started or that they started attending in 1995 and really how could that have happened if construction on the church didn't start until 2001. He goes back to his original answer and he says that they started attending in 1995. Construction began in 1990 and perestroika was in the 90s. But that still it doesn't blend with what he originally said because he originally said that his family helped build the church after perestroika. But if they started building it in 1990 and according to his testimony now perestroika was in the 90s. There's no connection there. So that's another example and discussion is on page 247 into 248. So I would argue that there are instances that the immigration judge cited in the record where his veracity overall really is undermined because of his vague and non-responsive answers. And I would argue if I could just quickly I won't address it in much detail that while he does cite the record for mistranslations there's nowhere in his brief where there were instances as Judge Pregerson pointed out where there maybe was trouble that the interpreter had trouble understanding him. But every time that the interpreter had trouble understanding him those misunderstandings were rectified and at the end of those points of the testimony Mr. Majuska said that what the interpreter did interpret in the end was what he said. And there's so I would argue that the government would argue that there was in fact no mistranslation whatsoever in the transcript and no due process violation because of that. All right your honors. Thank you counsel. Thank you. I'll give you a minute. So okay your honor I would say that in regards to her last argument about the his confusion about when he was at that church that's cleared up in the documented evidence of the pastor of the church which provided with the dates that he was there from 1996 to 2011 and that's at AR 843 to 844. So if there was any confusion in regards to the times that he was there it was cleared up by the documented evidence of the pastor. All right thank you counsel. Niyatsuka B. Wilkinson is submitted and we will next take up Ahlstrom versus DHI Mortgage Company.
judges: Wardlaw, Berzon, Pregerson